IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CHARMDAR MONTEZ TURNER,
     Petitioner,

vs.                         Case No.:  3:17cv869/RV/EMT

MARK S. INCH,[1]
     Respondent.
_____/

## ORDER and REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 14).  Petitioner filed a reply (ECF No. 16).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is

---

[1] Mark S. Inch succeeded Julie L. Jones as Secretary of the Florida Department of Corrections, and is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d).

further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 14).[2]  Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2011-CF-1306, with one count of Principal to Second Degree Murder with a Firearm (Count 1) and one count of Principal to Attempted Robbery While Armed with a Firearm (Count 2) (*see* Ex. A at 2).  Following a jury trial, Petitioner was found guilty as charged (Ex. A at 197, Exs. C, D, E).  On April 4, 2013, Petitioner was sentenced to fifty (50) years in prison on Count 1, and a concurrent term of fifteen (15) years in prison on Count 2, with pre-sentence jail credit of 272 days (Ex. B at 199–232).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D13-2235 (Exs. F, G, H).  The First DCA affirmed the judgment per curiam without written opinion on April 24, 2014 (Ex. I).  *Turner v. State*, 136 So. 3d 597 (Fla. 1st DCA 2014) (Table).  The mandate issued May 12, 2014.

---

[2]  Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 14).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

On October 16, 2014, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. J at 1–5). The state circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing an amended motion within sixty (60) days (*id.* at 6–7). Petitioner filed an amended motion, and then a second and third amended motion (*id.* at 8–67). The state circuit court treated the three amended motions collectively as a single amended Rule 3.850 motion, and summarily denied it on October 19, 2015 (*id.* at 68–78). Petitioner appealed the decision to the First DCA, Case No. 1D15-5601 (*id.* at 167). The First DCA affirmed the decision per curiam without written opinion on April 21, 2016 (Ex. K). *Turner v. State*, 189 So. 3d 765 (Fla. 1st DCA 2016) (Table). The mandate issued May 17, 2016 (Ex. K).

On April 28, 2016, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D16-1965, alleging ineffective assistance of appellate counsel (Ex. L). The First DCA denied the petition on the merits on May 18, 2016 (Ex. M). *Turner v. State*, 190 So. 3d 1161 (Fla. 1st DCA 2016) (Mem).

On August 22, 2016, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Ex. N at 1–8). On September 14, 2016, the state circuit court denied the motion, on the ground that Petitioner's claim was not cognizable in a Rule 3.800(a) motion (*id.* at 9–10). Petitioner appealed the decision to the First DCA, Case No. 1D16-5327

(Ex. O).  The First DCA affirmed the decision per curiam without written opinion on May 17, 2017 (Ex. Q).  *Turner v. State*, 226 So. 3d 813 (Fla. 1st DCA 2017) (Table).  The mandate issued June 13, 2017 (Ex. Q).

Petitioner filed the instant federal habeas action on December 4, 2017 (ECF No. 1).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.  Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > **(2)**  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue.  *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald,* — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as

opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases.  *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)]  does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").  Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court

must independently consider the merits of the petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam). In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g.*, *Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"). Neither the

Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications.  *See Cave v. Sec'y for Dep't of Corr.*, 638 F.3d. 739 (11th Cir. 2011).  However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision."  *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied the AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See Panetti*, 551 U.S. at 954.  Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this standard is difficult to meet, that is because it was meant to be."  *Richter*, 562 U.S. at 102.

## III.   EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner exhaust available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct'

alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. *Duncan*, 513 U.S. at 365–66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); *Picard*, 404 U.S. at 277–78.

The Supreme Court has provided lower courts with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In *Picard v. Connor*, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner makes a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. *Anderson v. Harless*, 459

U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982). In *Anderson*, the Sixth Circuit Court of Appeals granted the habeas petition on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. 459 U.S. at 7 (citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Anderson*, 459 U.S. at 7. On review by the Supreme Court, the Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the <u>cited</u> case advanced a federal claim. *Id.*, 459 U.S. at 7 & n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in *Duncan v. Henry*, 513 U.S. 364. The *Duncan* Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the

petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[3]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." *Duncan*, 513 U.S. at 365–66.

In *Baldwin v. Reese*, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004).  The *Baldwin* court commented that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  *Id.*, 541 U.S. at 32.  With regard to this language, the Eleventh Circuit explained in *McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005):

---

[3] The petitioner in <u>Duncan</u> raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.  513 U.S. at 366.

If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" *McNair* [*v. Campbell*], 315 F. Supp. 2d at 1184 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[4]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. *See Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See Coleman v. Thompson*, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640

---

[4] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

(1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Bailey*, 172 F.3d at 1303. In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar. *Id.* A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question. *See Harris v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. *Lee v. Kemna*, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state

court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[5]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  *Id.*  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default, the petitioner must show cause for the default and prejudice resulting therefrom, or that the federal court's failure to reach the merits of the claim would result in a fundamental miscarriage of justice.  *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Schlup v. Delo*, 513 U.S. 298,

---

[5] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995);

327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.* Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence. *See McQuiggin v. Perkins*, — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013). As the Court stated in *Schlup*, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]." 513 U.S. at 332; *see also House v. Bell*, 547 U.S. 518, 537, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

Within this framework, the court will review Petitioner's claims.

## IV.    PETITIONER'S CLAIMS

A.    Ground One:  "Trial court violated due process by prohibiting relevant evidence of defense's theory of innocence.  U.S.C.A. Const. 5, 14."

---

*Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994).

Petitioner alleges the State "opened the door" to evidence that the victim was a drug dealer "known to have money" (ECF No. 1 at 5).[6]  Petitioner argues that once the State "opened the door," the trial court erred by refusing to allow the defense to present evidence in support of Petitioner's theory of defense, specifically, testimony that the victim was "a known drug dealer" (*id.* at 5–6). Petitioner asserts he presented this issue on direct appeal of his conviction (*id.* at 6).

Respondent contends to the extent Petitioner intends to present the same due process claim in federal court as he presented to the First DCA on direct appeal, the claim is unexhausted and procedurally barred (ECF No. 14 at 15–25). Respondent argues that the "sole source of Petitioner's constitutional due process claim" presented on direct appeal was "his very general citation *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)" (*id.* at 18). Respondent acknowledges that the First DCA's silent affirmance of Petitioner's conviction is presumed to be an adjudication "on the merits" of Petitioner's federal due process claim, within the meaning of § 2254(d) (*id.* at 20).  But Respondent argues the presumption is overcome, because there are reasons to think the First DCA decided the issue on purely state law grounds (*id.* at 21–22).  Respondent

---

[6] When referencing the parties' pleadings, the court refers to the page numbers automatically assigned by the court's electronic filing system, rather than the page numbers of

contends Petitioner asserted no federal basis for his argument in the trial court, and instead argued only that the evidence (that the victim was "a known drug dealer") was admissible under Florida's rules of evidence (*id.* at 18–22). Respondent argues the only reasoning the First DCA could have adopted in affirming the trial court is that such evidence was not admissible under state law (*id.* at 18–22). Respondent further argues that if the First DCA considered Petitioner's federal due process claim in the first instance on direct appeal, it would have done so under Florida's standard of fundamental error which, again, is purely a state law issue (*id.* at 21–22). Respondent contends Petitioner cannot show cause for the procedural default, and Petitioner asserts no claim of actual innocence; therefore, the claim is procedurally barred from federal review (*id.* at 23–25).

Respondent argues that if this court disagrees with its assessment of the exhaustion and procedural default issue, then the First DCA's rejection of Petitioner's claim would necessarily be "on the merits" (ECF No. 14 at 26). Respondent contends the state court's adjudication must be afforded deference under § 2254(d), because it was not contrary to or an unreasonable application of clearly established federal law (*id.* at 26–27).

In reply, Petitioner argues that his appellate counsel was ineffective for failing to present a federal due process claim on direct appeal (ECF No. 16 at 2–3).

Petitioner contends he is entitled to federal review of his due process claim under *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d (2012) and the fundamental miscarriage of justice exception (*id.*).

The state court record demonstrates that Petitioner presented the following issue as Issue III on direct appeal:

> THE TRIAL COURT VIOLATED APPELLANT'S RIGHT TO DUE PROCESS WHEN IT PROHIBITED APPELLANT FROM PRESENTING EVIDENCE RELEVANT TO HIS DEFENSE AND TO WHICH THE STATE HAD OPENED THE DOOR ON DIRECT EXAMINATION OF STATE WITNESS JESSIE.

(Ex. F at 38). Petitioner argued that the issue was preserved for appellate review (*id.*). With respect to the merits, Petitioner argued that, under *Chambers*, an accused has a fundamental right to present witnesses in his own defense, and this was so even if other rules of evidence, such as a hearsay rule, would normally cause such evidence to be excluded (*id.* at 38–39, 43). Petitioner cited at least two Florida state cases which resolved the due process issue on federal grounds, *Washington v. State*, 737 So. 2d 1208 (Fla. 1st DCA 1999) and *Vannier v. State*, 714 So. 2d 470 (Fla. 4th DCA 1998) (*id.* at 39–40). The undersigned concludes this was sufficient to alert the First DCA to the federal nature of Petitioner's claim, and thus satisfied the "fair presentation" requirement.

The next question is whether the First DCA adjudicated the merits of Petitioner's federal due process claim. Section § 2254(d) does not require a state

court to give reasons before its decision can be deemed to have been "adjudicated on the merits." *See Richter*, 562 U.S. at 99. When a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary. *Id.* The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely. *Id.* at 99–100.

Here, there is no reason to think the First DCA rejected Petitioner's claim on grounds other than the merits. In the parties' briefs to the First DCA, neither party argued that the federal issue was not preserved for appellate review, and the State did not argue that the claim should be resolved on any ground other than the merits (*see* Exs. F, G). Further, neither the trial court nor the First DCA indicated that it was deciding the claim on state-procedural principles or grounds other than the merits. Therefore, Respondent has not overcome the presumption that the First DCA adjudicated Petitioner's federal claim on the merits. The next step of the federal habeas analysis, then, is to determine whether Petitioner has demonstrated that the First DCA's adjudication of the federal due process claim was based upon

an unreasonable determination of the facts, contrary to clearly established federal

law, or an unreasonable application of that law.

     1.    Clearly Established Federal Law

In *Nevada v. Jackson*, 569 U.S. 505, 133 S. Ct. 1990, 186 L. Ed. 2d 62

(2013), the United States Supreme Court said:

> "[T]he Constitution guarantees criminal defendants 'a meaningful
> opportunity to present a complete defense,'" *Crane v. Kentucky*, 476
> U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) (quoting
> *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed.
> 2d 413 (1984)), but we have also recognized that "'state and federal
> rulemakers have broad latitude under the Constitution to establish
> rules excluding evidence from criminal trials,'" *Holmes v. South
> Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503
> (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.
> Ct. 1261, 140 L. Ed. 2d 413 (1998)).   Only rarely have we held that
> the right to present a complete defense was violated by the exclusion
> of defense evidence under a state rule of evidence.   *See* [*Holmes*,] 547
> U.S. at 331, 126 S. Ct. 1727 (rule did not rationally serve any
> discernible purpose); *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S. Ct.
> 2704, 97 L. Ed. 2d 37 (1987) (rule arbitrary); *Chambers v.
> Mississippi*, 410 U.S. 284, 302–303, 93 S. Ct. 1038, 35 L. Ed. 2d 297
> (1973) (State did not even attempt to explain the reason for its rule);
> *Washington v. Texas*, 388 U.S. 14, 22, 87 S. Ct. 1920, 18 L. Ed. 2d
> 1019 (1967) (rule could not be rationally defended).

*Id.* at 509.   A defendant's right to a meaningful opportunity to present a complete

defense is abridged by evidentiary rules that "infring[e] upon a weighty interest of

the accused" and are "'arbitrary' or 'disproportionate to the purposes they are

designed to serve.'"  *Scheffer*, 523 U.S. at 308 (quoting *Rock*, 483 U.S. at 56, 58).

In *Holmes*, the state trial court excluded evidence of third-party guilt in a capital murder case, on the ground that the proffered evidence did not raise a reasonable inference of the defendant's innocence, in light of strong forensic evidence of the defendant's guilt. 547 U.S. at 329. The Supreme Court opined that the state court's ruling was arbitrary, because it evaluated the strength of only one party's evidence (the prosecution's), and thus could reach no logical conclusion regarding the probative value or the potential adverse effects of admitting the evidence offered by the defense. *Id.* at 331.

In *Rock*, the Supreme Court held that a rule prohibiting hypnotically refreshed testimony was unconstitutional because "[w]holesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all post-hypnosis recollections." 483 U.S. at 61.

Another arbitrary rule was held unconstitutional in *Crane*. There, the defendant was prevented from attempting to show that his confession was unreliable because of the circumstances under which it was obtained, and neither the state supreme court nor the prosecution "advanced any rational justification for the wholesale exclusion of this body of potentially exculpatory evidence." 476 U.S. at 691.

In *Chambers*, a murder defendant called as a witness a man named McDonald, who had previously confessed to the murder.  When McDonald repudiated the confession on the stand, the defendant was denied permission to examine McDonald as an adverse witness based on the State's "'voucher' rule," which barred parties from impeaching their own witnesses.  410 U.S. at 294.  In addition, because the state hearsay rule did not include an exception for statements against penal interest, the defendant was not permitted to introduce evidence that McDonald had made self-incriminating statements to three other persons.  Noting that the State had not even attempted to "defend" or "explain [the] underlying rationale" of the "voucher rule," *id.* at 297, the Supreme Court held that "the exclusion of [the evidence of McDonald's out-of-court statements], coupled with the State's refusal to permit [the defendant] to cross-examine McDonald, denied [the defendant] a trial in accord with traditional and fundamental standards of due process," *id.* at 302.

Finally, in *Washington*, state statutes barred a person who had been charged as a participant in a crime from testifying in defense of another alleged participant unless the witness had been acquitted.  As a result, when defendant Washington was tried for murder, he was precluded from calling as a witness a person who had been charged and previously convicted of committing the same murder.  Holding that the defendant's right to put on a defense had been violated, the Supreme Court

noted that the rule embodied in the state statutes could not "even be defended on the ground that it rationally sets apart a group of persons who are particularly likely to commit perjury," since the rule allowed an alleged participant to testify if he or she had been acquitted or was called by the prosecution.  388 U.S. at 22–23.

The Eleventh Circuit uses the following analysis in applying Supreme Court precedent to the issue of whether a trial court's evidentiary ruling deprived a defendant of his constitutional right to a meaningful opportunity to present a complete defense, under the Fifth and Sixth Amendments:  (1) whether the right was actually violated; and if so, (2) whether the error was "harmless beyond a reasonable doubt."  *United States v. Hurn*, 368 F.3d 1359, 1362–63 (11th Cir. 2004).  A trial court's exclusion of a defendant's evidence violates the Compulsory Process and Due Process guarantees in four circumstances:

> First, a defendant must generally be permitted to introduce evidence directly pertaining to any of the actual elements of the charged offense or an affirmative defense.  Second, a defendant must generally be permitted to introduce evidence pertaining to collateral matters that, through a reasonable chain of inferences, could make the existence of one or more of the elements of the charged offense or an affirmative defense more or less certain.  Third, a defendant generally has the right to introduce evidence that is not itself tied to any of the elements of a crime or affirmative defense, but that could have a substantial impact on the credibility of an important government witness. Finally, a defendant must generally be permitted to introduce evidence that, while not directly or indirectly relevant to any of the elements of the charged events, nevertheless tends to place the story presented by the prosecution in a significantly different light, such that a reasonable jury might receive it differently.

*Id.* at 1363.

　　2.　　Federal Review of State Court Decision

The evidentiary ruling at issue in this case was the trial court's exclusion of testimony that the victim was "a known drug dealer."  To put this proffered testimony in context, the following is an overview of the charges, the story presented by the State, and the defense theory.

Petitioner was charged as a principal to second degree murder with a firearm of Donald "Diego" Turner, and principal to attempted armed robbery of Donald "Diego" Turner (Ex. A at 2).  The story presented by the State at trial was that on March 21, 2010, Petitioner (known as "Sean") drove Jarvis Jessie, Mario Brewer, and Anthony ("Ant") Bell to Diego Turner's home with the intent to rob him; that the men saw Diego and approached him; that during the attempted robbery, Petitioner encouraged Jarvis Jessie to shoot Diego; and that Jarvis Jessie shot and killed Diego (Ex. C at 154–66).

The theory presented by the defense during opening statements was that the evidence supported only a manslaughter charge as to Jarvis Jessie; that it would show that Petitioner had no involvement in the actual shooting of Diego Turner; and that it would show that Jarvis Jessie, Petitioner, Mario Brewer, and Anthony Bell never even made an attempt to rob Diego Turner (Ex. C at 166–80).  Defense

counsel asserted the evidence would show that Jarvis Jessie was charged with the killing of Diego Turner; that he entered a plea to manslaughter; that he was facing a maximum sentence of 30 years; and that he was anticipating that his sentence would not exceed 10.8 years, but was hopeful that his sentence would be even less if he testified against Petitioner (*id.*).  Defense counsel asserted the facts supported Mr. Jessie's guilt of manslaughter, but not second degree murder (*id.*).  Counsel asserted the evidence would show that Petitioner, Mr. Brewer, and Mr. Bell began to approach Diego's home, but then decided to run back to their vehicle (*id.*). Counsel asserted the evidence would show that Jarvis Jessie, who was the only person carrying a gun, also began to run away, but then looked back toward Diego's house (*id.*).  Counsel asserted Jessie would testify he thought he saw something in Diego's hand and was afraid it was a gun, so Jessie shot in Diego's direction to "scare him off" and enable him (Jessie) to flee (*id.*).

The State presented testimony of Sheryl Bowden, who stated she was Petitioner's grandmother and Diego's aunt (Petitioner and Diego were cousins) (Ex. D at 257).  Ms. Bowden testified that on the evening of the shooting, Petitioner, Anthony Bell, and a third man came to her home and borrowed a car, because Petitioner stated his baby was sick (*id.* at 258–59).

Meka Turner, the victim's wife, testified that Petitioner was her husband's younger cousin (Ex. D at 261–62).  Ms. Turner testified she had known Petitioner

for four or five years (*id.* at 262).   Ms. Turner testified that Diego's relationship

with Petitioner had become "bad" in the week prior to the shooting, and the two

were mad at each other, because Diego suspected that Petitioner had burglarized

his vehicle (*id.* at 263–64).   Ms. Turner testified that when she and Diego arrived

home on the night of March 21, 2010, she saw three men as she was getting out of

the vehicle (*id.* at 66–69).   Ms. Turner testified she alerted Diego, and he told her

to run (*id.*).   Ms. Turner testified that as she was running to the front door of their

home, she heard a voice say, "Go.  Get that Nigger.  Shoot that Nigger.  Get him"

(*id.* at 269).   Ms. Turner testified Diego was facing the front door of their home,

and she was behind him and could see three people "just standing there, not

moving, not saying anything" (*id.*).   Ms. Turner testified Diego was trying to get

the key in the door of and said, "Oh my gosh.  I can't believe this is happening to

us." (*id.*).   Ms. Turner testified she heard the man with the gun say, "Don't move,

don't move," and it was a different voice than the voice that said, "Get him" (*id.* at

270, 291).   Ms. Turner continued:

> So as we're at the door, my husband—the person with the gun
> is down here.  They have the gun raised up over the wooden staircase
> like that at both of us and he's [Diego] able to get the door open. He
> brings the door and that's—I'm coming around, he grabs me by my
> front of my bra here and swings me into the house.  So when I'm
> coming into the living room falling backward like this, and my
> husband comes into the trailer, he's out—the door is still wide open.
> He comes in, and not even a foot, he stops, and then he turns and he
> goes to the door and reaches out like that in a kneeling position, like

> this.  He reaches out like that.  And as he did that, we hear pow.  And
> I was like, "'Oh, my God."  And I jumped down and I stood up
> immediately, and he just stood up like this.  He stood up and he shut
> the door with his back turned towards me.  And he was like, "Oh, I've
> been shot."  And I was like, "Oh, my God.  Where, where, where?"
>
> And he takes off running to the back room.  And as I'm running
> behind him, I stop in the middle of the hallway and I recognize that
> the door was still open.  So I run, try to lock the door.  I turn around
> and I came back to my husband in the room on the floor and that's
> where I was talking to him at.
> . . . .
> He was breathing.  He didn't move.  He was laying [sic] chest
> down and his face was to the side, and he was like (heavy breathing).

(Ex. D at 270–71).  Ms. Turner testified that she recognized the voice of the person

who said, "Get him, shoot him," and it was Petitioner's voice (*id.* at 272, 276, 284,

287–88, 290, 294).  Ms. Turner testified that Diego did not have a gun at any point

that evening (*id.* at 272).

The medical examiner testified that Diego died from a gunshot wound to the

chest (Ex. C at 201–08).

Ricardo Turner, the victim's brother, testified that approximately one week

prior to the shooting, he, Diego, and Petitioner left Diego's trailer and went to the

dog track together (Ex. D at 339–40).  Ricardo testified he (Ricardo) left the truck

he had driven (a 2005 Dodge Ram 2300 which belonged to Diego but was being

used by Ricardo) at Diego's trailer (*id.* at 343).  Ricardo testified that Diego and

Petitioner were on good terms when they went to the dog track (*id.* at 344–45).  He

testified that Diego tried to "look out for" Petitioner and was trying to be a role model for him (*id.*). Ricardo testified that when they arrived at the track, they went to play poker, but after "a little while," Petitioner "slipped away," and Ricardo assumed that Petitioner went to bet on the dogs (*id.* at 340, 344). Ricardo testified that he and Diego left the dog track and returned to Diego's trailer (*id.* at 340–41). Ricardo testified that when they arrived at the trailer, they found that the truck (the 2005 Dodge Ram 2300) had been broken into (*id.*). Ricardo testified he and Diego suspected Petitioner committed the burglary and called him on the phone to accuse him of it (*id.* at 340–42, 345–46). Ricardo testified Petitioner denied committing the burglary and became angry (*id.* at 342, 346–47). Ricardo testified he (Ricardo) threatened to "spank" Petitioner (*id.* at 342). He testified that Petitioner did not threaten to harm him or Diego (*id.*).

Jennifer Norman, a crime scene technician with the Escambia County Sheriff's Office, testified that a semiautomatic handgun was found under Diego's body in the bedroom (Ex. D at 215, 225, 227). Ms. Norman testified there was no evidence that the handgun had been fired (*id.* at 225).

Both Jarvis Jessie and Mario Brewer testified at Petitioner's trial. Mario Brewer testified that on the night of the shooting, Petitioner drove him, Anthony Bell, and a fourth man to the trailer park off Augusta Avenue "to see somebody," but Brewer did not know who they were going to see (Ex. E at 396). Brewer

testified he did not know Diego Turner or anyone who lived in the trailer park off Augusta Avenue (*id.* at 395). Brewer testified the four of them got out of the vehicle and began walking on the side of the victim's trailer (*id.* at 397). Mr. Brewer testified that the fourth man (Jarvis Jessie) was "a little further up ahead," and when Brewer, Petitioner, and Bell got close to the trailer, they heard a gunshot (*id.*). Brewer testified Jarvis Jessie went one way, and he, Petitioner, and Bell went the other way (*id.* at 397–98).

On cross-examination, Mario Brewer testified he heard Petitioner yell, "Get the Nigger" (Ex. E at 404–05). Brewer then admitted that during his pre-trial deposition, he stated he never heard Petitioner or anyone else yell anything on the night of the shooting (*id.* at 405–06). Upon further questioning by defense counsel, Brewer testified that he misspoke when he testified that he heard Petitioner yell something (*id.* at 406–07).

Jarvis Jessie testified that he was charged with the killing of Diego Turner; that he entered a plea to manslaughter; that he was facing a maximum sentence of 30 years, but was anticipating a sentence of not more than 10.8 years; and that he was hopeful his sentence would be even less if he testified at Petitioner's trial (Ex. D at 348–51, 362). Mr. Jessie testified he did not remember which of the other three men in the car suggested they rob someone on the night of March 21, 2010, but as far as he knew, there was no confusion among the four of them that they

were going to rob someone (*id.* at 353–54). Jessie testified there was no discussion of the details (*id.* at 356). Mr. Jessie testified Petitioner drove the vehicle to Augusta Avenue (the location of the victim's residence) (*id.* at 355). Jessie testified that when they first arrived, the victim's vehicle was not there, but the victim's vehicle arrived while Petitioner was parking (*id.*).

The prosecutor continued to question Mr. Jessie as follows:

Q.    What was the thought about why this person would be a good target?

A.    Knowing they had money.

Q.    And you got to speak a little bit louder for me, please.

A.    Known to have money.

Q.    Okay. So he was—the person that y'all were supposed to rob was known to have money?

A.    Yeah, drug money.

Q.    When you hear that you were going to hit a lick [sic], were you told who you were going to rob?

A.    Probably, yeah. I don't know.

Q.    You just don't remember?

A.    Yeah.

Q.    Okay. Did you know the name Diego Turner before this?

A.    Diego, not the last name.

> Q.    Okay.  So you knew Diego?
>
> A.    Yeah.
>
> Q.    So is it safe to say that whoever said "Hey, we're going to hit a lick," said, "Hey, we're going to go hit a lick and it's Diego?
>
> A.    Yeah.
>
> Q.    Do you remember that happening or are you just assuming it probably did?
>
> A.    I'm assuming.

(Ex. D at 356).

Mr. Jessie then described the shooting:

> The victim got out of the truck, him and his wife, they saw us approaching, they ran in the house.  When they ran, the other three guys took off running, so I took off running behind them.  He [the victim] ran back out, and I thought he had a gun and I just shot.

(Ex. D at 358–59).  Jessie testified he did not actually see a gun, but he thought the victim may have one because he was "fumbling" (*id.* at 359).  Mr. Jessie testified he did not hear Petitioner yell anything like "Get him.  Shoot him." (*id.* at 360, 367–68).

On cross-examination, Mr. Jessie reiterated that he shot at the victim because he thought the victim had a gun (Ex. D at 365).  Defense counsel asked, "And why did you think the guy had money?" (Ex. D at 369).  The prosecutor objected on grounds of relevance (*id.*).  At the bench, the court asked defense

counsel how the testimony was relevant, and defense counsel responded that the victim was a drug dealer, and that was the reason Mr. Jessie thought he would have a gun (*id.* at 369–70). The court excused the jury, and asked defense counsel to proffer the testimony:

> MR. KYPREOS [defense counsel]: My proffer is he's going to say that the guy thought he had money because he was a drug dealer. That also would explain why he thought the guy had a gun. Drug dealers are know to have guns to protect their money. The jury—his [Jarvis Jessie's] credibility is at issue. We're trying to convince the jury that he [Jessie] really thought the guy had a gun, and that's why, . . . besides his actions, the way he acted. But I think we're entitled to show that.
>
> THE COURT: All right. Is there a self-defense instruction coming?
>
> MR. KYPREOS: There's no self-defense coming here. Not from us.
> . . . .
> But the point is that, you know, they're going to be probably attacking him [Jessie] on whether or not he really had a reason to believe he [Diego] had a gun and question his judgment on that. Our point is he acted the way he thought. He used poor judgment. This is not a, you know, depraved mind situation for murder two. The most he [Jessie] committed was manslaughter, and even if he assumed that my client assisted him in committing this, the most he could be guilty of is manslaughter.
>
> THE COURT: Well, I don't think that's a proper argument and I'm not going to allow you to make that argument. But as to this issue as to why he went there with the robbery scheme, you think it's not relevant?
>
> MR. GADDY [the prosecutor]. He [Jessie] spelled it out because they thought he [Diego] had money. I mean, that's all that

matters. There's no sense whatsoever to drag this man through the mud. All he's doing is trying to lessen the victim in the eyes of the jury. It doesn't make it a manslaughter if you're a drug dealer. I mean, they're treated just like any other human being. So there's no relevance. It's absolutely prejudicial. And the fact that he's a drug dealer, there's no way that that bolsters the credibility of the witness. And if it does, it's so incredibly minor that it's outweighed by the prejudicial impact to the victim in the case.

MR. KYPREOS: Judge, the rule in the Eleventh Circuit is that firearms are the tools of the trade of drug dealers. Everybody knows drug dealers have guns. Everybody knows why they have guns and it goes to the reasonableness of his judgment and the reasonableness of his claim that he thought this man was armed.

THE COURT: Well, let me ask you this. I mean, obviously, I've heard testimony that he can't recall who said let's go rob him, but somebody was–

MR. KYPREOS: True.

THE COURT: Somebody was driving the car, somebody drove him there.

MR. KYPREOS: Right.

THE COURT: So he thought that somebody had money. So, regardless of that, he went there for money. Let me just ask you that, at some point—let me just ask you this. There's a lot of folks here that are in the military or retired military. Is that going to be relevant? I mean, you break into someone's house, you probably—

MR. KYPREOS: No, that–

THE COURT: You probably risk—listen to me. You probably risk someone having a gun. Probably in this part of the country, probably most folks have guns. There may be a lot of them. But I don't understand the drug dealer.

MR. KYPREOS:   Judge,  I didn't open this door, the State opened the door.

THE COURT:  How'd they open it?

MR. KYPREOS:  The State asked him that, you know, whether or not he [Jessie] thought he [Diego] had money.  The State went into the subject of why, you know, he thought the guy had money.  He can't remember who, you know, what the others may have thought, but they got into the subject with it.
. . . .
You know, as sure as I'm standing here, when we get into the closing argument, they're going to be challenging his [Jessie's] claim and the reasonableness of his claim that he thought that the guy was armed.  They're going to be arguing an entirely different story.
. . . .
MR. GADDY:  I think the elephant in the room that we're missing is the man was dead on top of a gun.  I mean, he's got all the argument he needs right there.  He was smart to believe he had a gun because the man did have a gun.  You know, he went back and got one or he had one the whole time, whatever their argument is going to be.  There—I don't know what the relevancy would be of calling this man a drug dealer and showing—parading that in front of the jury.  It is incredibly prejudicial.   Any probative value is so incredibly minimal that it's vastly outweighed by the prejudicial effect of calling this person a drug dealer.

There's been nothing else about that thus far in the case, and to bring it out right here and now and to say that that's a relevant factor in this case, I just don't think it's right.

MR. KYPREOS:  Judge, this is ridiculous.  I'm not going to be—this isn't going to be a feature of the trial.  I'm not going to be arguing to the jury about the fact that he's a drug dealer.  What I'm trying to get across to the jury is the reasonableness of my client's— excuse me, of Mr. Jessie's claim that he thought the gentleman was armed.  And I want to be—I'm not going to tip off all my closing argument.  There are other circumstances that bolster this.  But one reasonable factor for him to have believed that that man was armed,

and in looking at his actions at the time, if he thought that guy was a drug dealer and he thought the actions were coming back and he had gone into the house and came back out, according to his version, then it's an important fact to corroborate his [Jessie's] claim and show the reasonableness of his claim that he thought the man was armed and that's why he shot at him, not because somebody said, "Get the Nigger" or·"Shoot the Nigger," but because he was running, as he claims, and to corroborate his version.  And, surely, the State is not going to stand there and say—

. . . .

—that it's not reasonable to think drug dealers have guns to protect their drugs and money.

. . . .

My point is just going on what this man [Jessie] believed.  And it's not even really a question of whether he was in fact a drug dealer, the question is whether or not this man, this witness, Mr. Jessie thought he was a drug dealer.  I'm not even saying the man was a drug dealer.

THE COURT:  Well, let me let him ask question and let me hear what the answer is.

Mr. Jessie, the question is going to be asked of you, "Why did you think he had money?"  Do you know, or are you going to guess, or were told?

THE WITNESS:  He a [sic] known drug dealer.

THE COURT:  Okay.  So his answer is going to be he's a known drug dealer.  That's what the answer is going to be.

Now, is it relevant to this trial?

You're saying whatever relevance that has, there's a prejudicial value because it besmirches the decedent.

MR. GADDY:  Of course.  And the other thing that I think is important is the question that he asked.  He didn't ask, "Why did you think he was armed?"  He asked, "Why did you think he had money?"

And, you know, there's no relevance there whatsoever.  I mean, he's merged his argument to this why he would be armed, but that's not even what he was asking about.  The question he was asking was why does he have money.  And there's certainly no relevance there whatsoever.  And I think it's disingenuous to then merge it into oh, what I really wanted is to show that he would be armed.  And I just don't—he can—you can ask him, "Was he known to carry a gun?"  That's fine.  "Was he known to have a gun? Was he known to protect himself?"  That's fine.  But to label him a drug dealer is incredibly prejudicial.  By asking the question was he known to be armed, he gets his same point across.

THE COURT:  Well, let me—have you asked the question?

Was he known to be armed, or do you know?

THE WITNESS:  I would think he will be armed.  He sells large quantities of drugs.

THE COURT:  So his answer is, "I would think he would be armed because he sells large quantities of drugs."

MR. KYPREOS:  Right.

. . . .

And I'm not going to ask him that, Judge.

THE COURT:  Mr. Kypreos, let me finish.  Here's the issue you've got.  You've got an unsophisticated crime—

MR. KYPREOS:  Right.

THE COURT:  —with individuals that aren't that smart.  They drive a vehicle that people recognize leaving DNA everywhere.  I mean, it's a story of our criminal justice system and folks like this are caught and incarcerated for great lengths of time so these things don't happen again.  But, on the other hand, you want to say there's no plan, as far as I can hear from this gentleman, we're going to rob him, but we don't even know, you know, a simple football thing, well, you go

this way and block him here, and I'm going to take the gun and this.  I hear—look, you can't have your cake and eat it too.  This is so unsophisticated, the Apple Dumpling Gang, if you will, well, you just go here and this and that.  But the other point, you want to say, well, these guys are so sophisticated, he's a known drug dealer and so I'm assuming he has a gun.  Look, to me, I think the only reason this would come in is to besmirch the reputation of the deceased.

. . . .

I think the fact that you can get in that he believed he had money, I think that's the impetus for the robbery.  I don't care if he had money because he was Bill Gates or was Al Capone, or you know, his cousin that [sic] was trying to mentor him.  I mean, you know, who knows.

. . . .

I don't see it to be relevant.

MR. KYPREOS:  . . . My point is just what the witness said a minute ago.  He thought . . . the man had money because he was a known drug dealer.

(Ex. D at 369–81).   After  more  discussion,  the  court  agreed  to  allow  defense

counsel to ask Mr. Jessie, "Did you think he'd have a gun to protect his money?"

but with no mention that the victim was a drug dealer (*id.* at 383–84).

When the jury returned, defense counsel continued cross-examination of Mr.

Jessie:

Q.     Let me rephrase the question for you, Mr. Jessie.  You've already described to the jury how, by Mr. Diego Turner's actions, you thought he had a firearm.

A.     Yes, sir.

Q.     But you also said you thought he had money there; right?

A.     Yes, sir.

Q.      And did you think at the time he might have a gun to protect his money?

A.      Yes, sir.

Q.      So between that concern you had and his actions, did you really think that he might have a gun at that point in time?

A.      Yes, sir.

Q.      And at no time did Charmdar Turner encourage you to shoot at him?

A.      No, sir.

Q.      That's correct?

A.      Yes, sir.

(Ex. D at 384–85).

During closing arguments, defense counsel focused on the issue of intent. Counsel argued that in order to find Petitioner guilty of second degree murder on a principal theory, the State was required to prove, beyond a reasonable doubt, that (1) Petitioner had a conscious intent that the criminal act (i.e., the shooting of Diego Turner) be done, (2) Petitioner did an act or said some words to help commit the criminal act, <u>and</u> (3) when Petitioner did the act or said the words, he had a conscious intent that the shooting be done.  Defense counsel argued that if the evidence showed that Petitioner made a statement during the alleged attempted robbery, Petitioner was not guilty as a principal if his statement did not actually

cause the criminal act; for example, if the person committing the criminal act did

not hear the statement. Counsel argued that the key question was why Jarvis Jessie

shot at the victim; and the answer came "straight from the horse's mouth":

> We got it from Mr. Jarvis Jessie as to why he shot at Diego Turner.
> Okay. The State calls question [sic] into that by suggesting he's
> trying somehow to minimize his role. Whoa, wait a minute. Time
> out. That makes no sense. Yes, he entered a plea and, yes,
> supposedly he's going to get at least 10.8 years and, yes, he testified
> that he hoped that by testifying here today that would lead him to get
> less time. Mr. Jessie had every reason to try and lie about my client.
> He had every reason, if he so desired, to exaggerate my client's role in
> the case. The best way he could really get himself a lot of substantial
> assistance is to say, yeah, I shot him. He said shoot the nigger and I
> had lean [an illegal drug] that day and I just been in a fight so when I
> heard him say shoot the nigger, I shot him. But that isn't what he
> testified to. . . . But what does he say, he comes in and says—he
> doesn't say I shot the guy because of anything Charmdar Turner says.
> He says I came around the trailer and Turner started running into the
> trailer, the other guys got scared and they ran off and I started to run
> off, and as I started to run off the door opened again or Mr. Diego
> Turner came to the door and Jessie says I got scared. I thought he
> might have a gun. He thought there was something about the motion,
> the way the man was acting at the door that he had a gun and he says I
> shot at him. I thought he might have a gun to protect the money so I
> fired. He didn't say he actually saw a firearm. And whether or not
> Diego Turner actually had a firearm, the one that was found later not
> at that point is beside the point, what is important is why is Jarvis
> Jessie doing what he's doing? Is he doing it because Charmdar
> Turner asked him to do something or is it something else? And he's
> saying I thought the guy had a gun so I shot. I shot. Okay. Only one
> round. Didn't shoot several rounds. Fires one shot because he's
> hoping to scare him off and he's afraid he's maybe going to get shot
> and he says I'm running away at that time. I'm running away at that
> time. Okay. He also says that at no time did he hear anybody, in
> particular the defendant, say get him or shoot him. At no time did he

hear anything like that.  So even if the defendant supposedly did say that as Meka Turner claims, Jarvis Jessie says I didn't hear that and he has no reason to lie about that.  If he's really trying to help himself out he would want to say I heard something like that.  He knows that's what the State's claiming.  But that isn't what he said.  And he tells the truth.  He never heard that. . . .  Meka testified that the time her husband got shot he had scrunched down. . . .  He may have been reaching for the door to close the door but he scrunched down, it's dark out there, there's no lighting, what might Mr. Jessie think, this guy must have a gun, he's scrunching down, he seems to be reaching out.  He may not have a gun in his hand.  Maybe he's reaching for the doorknob to close it.  But that's not what it would look like in the eyes of Jarvis Jessie that night.  So we know there's some act that occurred that could have been construed by Mr. Jessie, reasonably construed that this guy might have a firearm and I need to do something to avoid getting killed myself.

. . . .

[T]he State's theory is, oh, the defendant said shoot him, get him, and therefore that shows depraved mind or evil intent and that he was the cause of the shooting.  Well, first of all, again, Jarvis Jessie said he never heard that.  But let's assume that Meka Turner did hear something just for the sake of argument only, even under her version of what happened, even if the defendant did make such a statement, it clearly had nothing to do with the shooting. . . .  [M]ost importantly, as Jarvis Jessie said, he never heard that statement if it was made.

. . . .

Now Mario Brewer . . . .  [H]e too said he never heard the defendant say get him or shoot him . . . .

. . . .

But the bottom line is, there's no reason to doubt Jarvis Jessie's testimony that he did not shoot that man because of anything my client said or did.

(Ex. E at 509–11, 513–14, 517, 527).

The jury was instructed on the principal theory of liability, second degree

murder and the lesser included offense of manslaughter, robbery and the lesser

included offenses, attempt, and the defenses of justifiable and excusable homicide (along with the standard instructions on reasonable doubt, weighing the evidence, etc.) (Ex. E at 538–54).

As previously discussed, the First DCA rejected Petitioner's federal due process in a one-word order, "AFFIRMED" (Ex. I).

The state court's exclusion of testimony that Diego Turner was "a known drug dealer" was not arbitrary. The parties' debate over the admissibility of the testimony included an even more comprehensive discussion of the trial evidence than is included here. The trial court thoroughly evaluated the evidence presented and proffered by both parties and the probative value of the proffered testimony in casting doubt on the prosecution's case. The jury had already heard (during the prosecutor's direct examination) Mr. Jessie testify that he and the others were going to rob a person who was known to have "drug money" (Ex. D at 355). The jury had already heard Mr. Jessie testify that he fired his gun because he thought he saw the victim fumble for a gun. The trial court permitted defense counsel to elicit Mr. Jessie's testimony that he thought the victim had money and he thought the victim might have a gun to protect his money. Permitting Mr. Jessie to additionally testify regarding the reason he believed the victim had money (i.e., the victim was a known drug dealer) would not have had any additional value in rebutting or casting doubt on the State's case. The only value to the defense was to

suggest that the victim's death was less important or even somewhat deserved because he was a drug dealer.

Petitioner failed to demonstrate that the state court's adjudication of his federal due process claim was contrary to or an unreasonable application of clearly established federal law. Therefore, Petitioner is not entitled to federal habeas relief on Ground One.

B. <u>Ground Two: "Petitioner's 50-year prison sentence is disproportionate to the crime, violating the 8th and 14th Amendments."</u>

Petitioner alleges the State and the trial judge permitted Jarvis Jessie, who was the actual shooter, to plead guilty to the lesser charge of manslaughter, with an assurance that he would be sentenced to 10.8 years (ECF No. 1 at 7). Petitioner alleges he was sentenced to 50 years, even though he did not possess a firearm or shoot the victim (*id.*). Petitioner contends his sentence was disproportionate to the offense and to Mr. Jessie's sentence (*id.*). Petitioner states he presented this claim on direct appeal (*id.*).

Respondent asserts Petitioner presented this claim as Issue IV on direct appeal, and the First DCA's silent affirmance constitutes an adjudication of the merits (ECF No. 14 at 28–30). Respondent asserts that the Supreme Court has never held that the Eighth Amendment requires proportionate sentences <u>between co-defendants</u>; therefore, Petitioner cannot show that the First DCA's rejection of

this aspect of his claim is contrary to or an unreasonable application of clearly established federal law authority (*id.* at 31–32). Respondent contends Petitioner faced a maximum possible sentence of life imprisonment on the second degree murder charge, and his 50-year sentence was not grossly disproportionate to the severity of the crime (*id.*).

   1.   Clearly Established Federal Law

   The Eighth Amendment of the United States Constitution states that "cruel and unusual punishments [shall not be] inflicted."  According to the Supreme Court, this clause "prohibits . . . sentences that are disproportionate to the crime committed."  *Solem v. Helm*, 463 U.S. 277, 284, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). However, "outside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare." *Id.* at 289–90. (quotation and edits omitted). In *Helm*, the defendant was sentenced to life imprisonment without parole for writing a "no account" check for $100. 436 U.S. at 281. The defendant was previously convicted of six felonies, including three convictions for third-degree burglary, one conviction for obtaining money under false pretenses, one conviction for grand larceny, and one conviction of driving while intoxicated (third offense). *See id.* at 279–80. The Supreme Court noted that Helm's crime was "one of the most passive felonies a person could commit. . . . It neither involved violence nor threat of violence to any person." *Id.*

Case 3:17-cv-00869-RV-EMT    Document 17    Filed 05/06/19    Page 45 of 78

at 296.  Further, all of Helm's prior crimes were nonviolent, and none was a crime against a person.  *Id.* at 297.  The Supreme Court stated that when sentences are reviewed under the Eighth Amendment, courts should be guided by objective criteria, including:  "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions."  *Id.* at 292.  The Court concluded that the sentence of life imprisonment without parole was "significantly disproportionate to [the] crime, and . . . therefore prohibited by the Eighth Amendment."  *Id.* at 303.

In *Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991), the Supreme Court recognized that its 5-to-4 decision in *Helm* "was scarcely the expression of clear and well accepted constitutional law."  501 U.S. at 965.  The Court went on to conclude that the Eighth Amendment contains no proportionality guarantee, except perhaps in the death penalty context.  *Id.* at 965, 994.  The Court then considered the defendant's argument that his sentence of life imprisonment without parole for possessing 672 grams of cocaine violated the Eighth Amendment, because it was imposed without any consideration of so-called mitigating factors, such as the fact that he had no prior felony convictions.  *Id.* at 994.  The Court recognized that, as with proportionality, an individualized determination that a punishment is "appropriate" is required in the death penalty

context.  *Id.* at 995.    However, the Court refused to extend the so-called "individualized capital-sentencing doctrine" to non-capital sentences.    *Id.*  The Court upheld Harmelin's sentence of life imprisonment without parole as constitutional.

After *Harmelin*, the Supreme Court considered Eighth Amendment challenges to non-capital sentences imposed pursuant to recidivist laws.    In *Lockyer v. Andrade*, 538 U.S. 63, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003), the Supreme Court considered whether "two consecutive terms of 25 years to life for stealing approximately $150 in videotapes is grossly disproportionate in violation of the Eighth Amendment" when imposed under California's "three strikes" law. 538 U.S. at 70.  The Supreme Court noted that the only relevant clearly established law amenable to the "contrary to" or "unreasonable application of" framework of § 2254(d)(1) "is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Id.* at 73 (citing *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring in part and concurring in judgment); *Helm*, 463 U.S. at 290; *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980)).  The Supreme Court held that the California Court of Appeal's decision affirming Andrade's two consecutive terms of 25 years to life in prison for a "third strike" conviction was not "contrary to" or an "unreasonable application" of "clearly established" law.  538 U.S. at 76.

In *Ewing v. California*, 538 U.S. 11, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003), the defendant shoplifted three golf clubs, each valued at $399. 538 U.S. at 18. Because the defendant had prior convictions of three burglaries and a robbery, he was sentenced to prison for twenty-five years to life under California's "three strikes" law. *Id.* at 20. The Supreme Court considered the gravity of the offense compared to the harshness of the penalty, but noted that the gravity of the offense was not merely shoplifting three golf clubs; rather, it was felony grand theft for stealing nearly $1,200 worth of merchandise after previously having been convicted of a least two "violent" or "serious" felonies. *Id.* at 28. The Court determined that Ewing's sentence was justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and held that it was not grossly disproportionate and therefore did not violate the Eighth Amendment. *Id.* at 30–31.

In sum, other than the life sentence imposed for the "most passive felony one could commit" in *Helm*, the Supreme Court has not reversed a non-capital, adult sentence for a term of years on Eighth Amendment grounds.

### 2.    Federal Review of State Court Decision

As Issue IV on direct appeal, Petitioner argued that his 50-year prison sentence was disproportionate to both his role in the offense and the sentence received by Jarvis Jessie who, as the shooter, had a greater level of participation in

the offense (Ex. F at 44–47).  Petitioner argued this constituted cruel and unusual punishment (*id.*).  The First DCA rejected the claim in an unexplained decision (Ex. I).

The statutory maximum sentence for Petitioner's convictions for principal to second degree murder with a firearm and principal to attempted robbery with a firearm was life in prison (*see* Ex. A at 221, 223).  According to Petitioner's sentencing scoresheet, Petitioner's lowest permissible prison sentence was 304.9 months (25.4 years) (*id.* at 219–22).  At Petitioner's sentencing hearing, defense counsel requested a downward departure based in part on proportionality considerations regarding the 10.8-year sentence that Mr. Jessie received as the shooter (*id.* at 201–05, 211–13).

The prosecutor responded to the proportionality argument as follows:

MR. GADDY:  On the issue of the comparability of the sentences between Mr. Jesse and Mr. Turner.  The Court was obviously present through the plea that Mr. Jesse [sic] entered and the sentencing hearing where that 10.8 years was imposed. And I believe that the Court is well aware that the State was not willfully and pleasantly entering into that agreement.  We did so because, frankly, our case against Mr. Jesse [sic] was very weak and we were concerned that we would not be able to prove the case should we go to trial.

THE COURT:  And I believe you requested 30 years; is that right?

MR. GADDY: Yes, Judge. And there was—certainly, there were circumstances that lead [sic] to the offer. And it had nothing to do with the amount of culpability that we assigned to Mr. Jesse [sic].

Unfortunately, in our job, we can't always dispense perfect justice. And that's what happened with the sentence that Mr. Jesse [sic] received.

(Ex. B at 209).

The trial court imposed sentence as follows:

Mr. Turner, I sat through the trial and the pretrial motions and everything. I'm obviously familiar with the case.

Your Counsel's request for a downward departure, I understand, but I'm going to reject.

As to the sentence that you deserve in this case, you know, I've thought about this carefully. I've kept an open mind until I came here today.
. . . .
As far as the state prison sentence, I've looked at your score sheet. Again, I've sat through the trial. I understood exactly what occurred, as far as what the jury found and what I heard.

And based on that, I'm going to impose a 50 year state prison sentence.

(Ex. B at 213–14, 216).

Petitioner's sentence was not a life sentence, and it was within Florida's statutory limit. Further, unlike *Helm*, Petitioner's offenses (second degree murder and attempted robbery) were not the "most passive felony one could commit." Petitioner has not demonstrated that the First DCA's rejection of his

proportionality claim was contrary to or an unreasonable application of clearly established federal law.  Therefore, he is not entitled to federal habeas relief on Ground Two.

C.    <u>Ground Three:  "Trial court violated due process and right to fair trial by allowing irrelevant collateral crime evidence.  U.S.C.A. 5, 6, 14."</u>

Petitioner alleges the trial court erred by allowing the State to introduce collateral crime evidence, specifically, evidence of Petitioner's alleged involvement in a prior burglary of the victim's truck (the burglary described by Mario Brewer) (ECF No. 1 at 8).  Petitioner alleges he denied any involvement in the burglary (*id.*).  Petitioner contends the evidence was irrelevant and unduly prejudicial (*id.*).  He asserts he presented this issue on direct appeal (*id.* at 9).

Respondent contends the claim is unexhausted and procedurally barred (ECF No. 14 at 33–38).  Respondent contends Petitioner argued this issue on only state law grounds in the trial court and on direct appeal and thus failed to fairly present a federal claim to the state courts (*id.*).  Respondent contends Petitioner cannot return to state court to exhaust this claim; therefore, it is procedurally defaulted for federal habeas purposes (*id.* at 37).

In reply, Petitioner argues that his appellate counsel was ineffective for failing to present a federal due process claim on direct appeal (ECF No. 16 at 4).

Petitioner contends he is entitled to federal review under *Martinez* and the fundamental miscarriage of justice exception (*id.*).

The state court record demonstrates that on direct appeal, Petitioner stated his claim as follows:

> THE TRIAL COURT ERRED BY ALLOWING THE STATE TO INTRODUCE EVIDENCE OF APPELLANT'S ALLEGED INVOLVEMENT IN THE PRIOR BURGLARY OF THE VICTIM'S TRUCK, WHICH WAS IRRELEVANT, PREJUDICIAL, AND PRESUMPTIVELY HARMFUL.

(Ex. F at 24). Petitioner's substantive argument addressed Florida law, with the bulk of it consisting of Petitioner's attempt to analogize his case to *Pratt v. State*, 1 So. 3d 1169 (Fla. 4th DCA 2009) and *Harden v. State*, 87 So. 3d 1243 (Fla. 4th DCA 2013). In both of those cases, the state appellate courts held that the trial court erred in concluding that the collateral crime evidence was relevant to the issues of motive and intent, because motive and intent were not pertinent issues at those trials. Additionally, in both cases, the appellate courts determined that the collateral crime evidence was not harmless under Florida's harmless error test.

Petitioner did not cite in conjunction with his claim a federal source of law on which he relied, nor did he label the claim "federal" or otherwise indicate a federal law basis for his claim. Petitioner did not make even a passing reference to due process, fundamental fairness, a fair trial, federal law, or the United States Constitution. Similarly, Petitioner did not cite a single federal case; and the state

cases he cited did not cite to, or decide the claim on, federal grounds.   The undersigned concludes that Petitioner did not "fairly present" a federal due process claim in the state courts (as he now does in Ground Three of his federal petition). *See McNair*, 416 F.3d at 1304 (holding that petitioner did not fairly present in state court his federal due process challenge to the jury's consideration of extraneous evidence; explaining:   "McNair never cited any United States Supreme Court or federal appellate court case dealing with extraneous evidence, nor did he mention the presumption of prejudice that arises under federal law when jurors consider such evidence.  Instead, he relied on state law opinions to argue a state law claim under a state law standard, citing a lone federal district court opinion (which itself did not mention the federal presumption of prejudice) only as part of a string citation illustrating various courts' holdings with respect to extraneous evidence in the jury room."); *see also Link v. Tucker*, 870 F. Supp. 2d 1309, 1324 (N.D. Fla. 2012) (holding that petitioner procedurally defaulted federal habeas claim regarding state trial court's admission of witness's allegedly irrelevant testimony where, on direct appeal, petitioner cited only Florida cases and no federal source of law in support of his claim of trial court error), *see also, e.g.*, *Crenshaw v. Sec'y, Fla. Dep't of Corr.*, No. 16-17735-D, 2017 WL 6761058, at *4–5 (11th Cir. Oct. 18, 2017) (unpublished but recognized as persuasive authority) (holding that petitioner did not fairly present state appellate court with federal due process

challenge to trial court's admission of collateral crime evidence where petitioner's arguments on direct appeal addressed whether the admission of such evidence was improper under Florida law, and although petitioner referenced the impact such admission had on his right to a "fair trial," he did not cite to any federal law and did not indicate any federal law basis for his claim); *Hartge v. McDonough*, 210 F. App'x 940 943 (11th Cir. 2006) (unpublished) (holding that petitioner did not fairly present state appellate court with federal due process challenge to trial court's admission of photograph where, on direct appeal, petitioner argued that probative value of photograph was substantially outweighed by danger of unfair prejudice, but argument included only a single reference to a fair trial with no citation to any case relying on federal constitutional law).

Petitioner is now barred by state procedural rules from returning to state court to present the claim of trial court error as a federal constitutional claim. *See Hall v. State*, 823 So. 2d 757, 763 (Fla. 2002) ("[A]n issue not raised in an initial brief is deemed abandoned"); Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."). Because further relief is not available in the state courts, Ground Three is considered procedurally defaulted.

Petitioner appears to assert ineffective assistance of appellate counsel ("IAAC") as cause for the procedural default (*see* ECF No. 16 at 4).  Although ineffective assistance of counsel which rises to the level of a constitutional deprivation may serve as cause for purposes of a procedural default analysis, the issue of ineffective assistance must first be presented as an independent state claim and exhausted in the state courts.  *Murray*, 477 U.S. at 488; *Orazio v. Dugger*, 876 F.2d 1508 (11th Cir. 1989).  In Florida, a claim of IAAC is actionable in a petition for writ of habeas corpus filed in the appellate court to which the appeal was taken. *See* Fla. R. App. P. 9.141(d); *Davis v. State*, 875 So. 2d 359, 372 (Fla. 2003).

Here, Petitioner filed a petition for writ of habeas corpus in the First DCA, alleging IAAC, but he did not present an IAAC claim based upon appellate counsel's failure to present a federal claim with respect to the trial court's admission of the collateral crime evidence (*see* Ex. L).  Further, because the procedural default occurred in the direct appeal proceeding, not the Rule 3.850 proceeding, Petitioner's reliance upon *Martinez* is misplaced.  *See Davila v. Davis*, — U.S. —, 137 S. Ct. 2058, 2065, 198 L. Ed. 2d 603 (2017) (declining to extend *Martinez* to a procedurally defaulted claim of ineffective assistance of appellate counsel). Therefore, Petitioner failed to show he is entitled to federal review of Ground Three through the "cause and prejudice" portal.

Additionally, Petitioner's conclusory assertion that "failure to consider this claim will result in a fundamental miscarriage of justice" (ECF No. 16 at 4) is insufficient to satisfy the "actual innocence" exception to the procedural bar. Therefore, Petitioner is not entitled to relief on Ground Three.

>    D.    Ground Four:  "The prosecutor's opening and closing statements regarding the weaknesses in the co-defendant's case denied right to fair trial under 6th Amend."

Petitioner alleges the prosecutor commented on facts not in evidence in both his opening statement and closing argument (ECF No. 1 at 10).  Petitioner alleges the prosecutor commented on the "weaknesses" in Jarvis Jessie's case as a means of explaining why Jessie was offered a deal to plead to manslaughter (*id.*). Petitioner contends these arguments improperly bolstered the State's case and encouraged the jury to convict Petitioner based upon "guilt by association" (*id.*). Petitioner asserts he presented this claim on direct appeal (*id.*).

Respondent contends the claim is unexhausted and procedurally barred (ECF No. 14 at 39–42).  Respondent contends Petitioner argued this issue on only state law grounds in the trial court and on direct appeal and thus failed to fairly present a federal claim to the state courts (*id.*).  Respondent contends Petitioner cannot return to state court to exhaust this claim; therefore, it is procedurally defaulted for federal habeas purposes (*id.* at 37).

In reply, Petitioner argues that his appellate counsel was ineffective for failing to present a federal due process claim on direct appeal (ECF No. 16 at 5). Petitioner again contends he is entitled to federal review under *Martinez* and the fundamental miscarriage of justice exception (*id.*).

Upon review of the state court record, the undersigned concludes that Petitioner did not fairly present a federal due process claim to the state courts.  In his initial appellate brief on direct appeal, Petitioner stated Issue Two as follows:

> THE PROSECUTOR'S COMMENTS IN OPENING STATEMENT AND CLOSING ARGUMENT REGARDING THE WEAKNESSES IN CODEFENDANT JESSIE'S CASE THAT THE PROSECUTOR CLAIMED LED THE STATE TO OFFER A PLEA TO A LESSER CRIME WERE IMPROPER AND DENIED APPELLANT OF HIS RIGHT TO A FAIR TRIAL

(Ex. F at 31).  Petitioner he did not label the claim "federal," nor did he reference a federal law basis for his claim in the body of his argument on the issue (*see id.* at 31–34).  Petitioner relied upon two cases in his argument on the merits of his claim, and cited a total number of six cases, all of which were state court cases and none of which addressed a federal issue with respect to a prosecutor's improper comments (*see id.*).

Petitioner cited one state case, *Cochran v. State*, 711 So. 2d 1159 (Fla. 4th DCA 1998), which cited a United States Supreme Court decision, but Petitioner cited *Cochran* in the "Standard of Review and Preservation" section of his brief, and he cited *Cochran* for the principle that the reviewing court must consider the

comments cumulatively, within the context of the closing argument as a whole, and with the context of the entire record, in order to determine if a reversal is required (Ex. F at 32).    The *Cochran* court did not decide the prosecutorial comment issue on federal grounds.  The *Cochran* court evaluated the prosecutor's comments within the "proper parameters" set forth by the Florida Supreme Court and as applied by the state appellate courts.  711 So. 2d at 1162–63.  The *Cochran* court concluded that the prosecutor's comments at issue in that case were improper and rose to the level of fundamental error under Florida state law.  *Id.* at 1163.  At the conclusion of its opinion, the *Cochran* court cited *Washington v. State*, 98 So. 605, 609 (Fla. 1923) and *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935) only to point out the "standard of prosecutorial conduct in a criminal trial," and to note "[t]hese standards of conduct set in an earlier generation are equally applicable today."  (*id.* at 1163–64).[7]

---

[7] The full context of the *Cochran* court's reference to *Berger* is the following:

In 1923, the supreme court set forth the standard of prosecutorial conduct in a criminal trial:

[E]xcessive vituperation or ridiculous epithets are out of place and should not be indulged in criminal prosecutions.  The prosecuting attorney occupies a semijudicial position.  He is a sworn officer of the government, with no greater duty imposed on him than to preserve intact all the great sanctions and traditions of the law.  It matters not how guilty a defendant in his opinion may be, it is his duty under oath to see that no conviction takes place except in strict conformity to law.  His primary considerations should be to develop the facts and the evidence for the guidance of the court

Petitioner's general reference to a "fair trial" and his citation to *Cochran*

were not sufficient to alert the First DCA that he was asserting a federal challenge

to the prosecutor's comments. *See Anderson*, 459 U.S. at 7 & n.3; *Duncan*, 513

U.S. at 365–66. *Cf. Wells v. Sec'y Dep't of Corr.*, No. 08–16663, 2009 WL

2873180, at *2 (11th Cir. Sept. 9, 2009) (habeas petitioner fairly presented federal

claim of denial of constitutional right to confront witnesses where petitioner cited

---

and jury, and not to consider himself merely as attorney of record
for the state, struggling for a verdict.

*Washington v. State*, 86 Fla. 533, 98 So. 605, 609 (1923). In a similar vein, the
United States Supreme Court wrote in *Berger v. United States*, 295 U.S. 78, 88,
55 S. Ct. 629, 633, 79 L .Ed. 1314 (1935), that a prosecutor is

the representative not of an ordinary party to a controversy, but of
a sovereignty whose obligation to govern impartially is as
compelling as its obligation to govern at all; and whose interest,
therefore, in a criminal prosecution is not that it shall win a case,
but that justice shall be done. As such, he is in a peculiar and very
definite sense the servant of the law, the twofold aim of which is
that guilt shall not escape or innocence suffer. He may prosecute
with earnestness and vigor—indeed, he should do so. But, while
he may strike hard blows, he is not at liberty to strike foul ones. It
is as much his duty to refrain from improper methods calculated to
produce a wrongful conviction as it is to use every legitimate
means to bring about a just one.

It is fair to say that the average jury, in a greater or less
degree, has confidence that these obligations, which so plainly rest
upon the prosecuting attorney, will be faithfully observed.
Consequently, improper suggestions, insinuations, and, especially,
assertions of personal knowledge are apt to carry much weight
against the accused when they should properly carry none.

These standards of conduct set in an earlier generation are equally applicable
today.

and discussed only one case in his brief on direct appeal in the state courts, *Abreu v. State*, 804 So.2d 442 (Fla. 4th DCA 2001), and in that case, the Florida appellate court determined that a state statute relieving a party of the need to prove unavailability before introducing prior testimony was "<u>unconstitutional as a violation of the Sixth Amendment's confrontation clause</u>.") (emphasis added); *Veach v. McNeil*, No. 3:06cv482/MCR/EMT, 2009 WL 3464137, at *33 (N.D. Fla. Oct. 21, 2009) (habeas petitioner fairly presented federal due process claim concerning prosecutor's comments during closing argument where, in petitioner's initial brief on direct appeal, petitioner styled the issue as a denial of his rights under the state constitution <u>and the Fifth Amendment of the federal Constitution; and petitioner cited four state cases which decided the issue of federal grounds</u>), *Report and Recommendation Adopted by*, 2009 WL 4348838 (N.D. Fla. Nov. 23, 2009).

As with Ground Three, Petitioner asserts IAAC as cause for the procedural default, and he cites *Martinez*. In Petitioner's state habeas petition alleging IAAC, Petitioner did not present an IAAC claim based upon appellate counsel's failure to present a federal claim with respect to the prosecutor's allegedly improper comments (*see* Ex. L). Further, because the procedural default occurred in the direct appeal proceeding, not the initial collateral review proceeding, Petitioner's

---

reliance upon *Martinez* is misplaced. Therefore, Petitioner failed to show he is entitled to federal review of Ground Four through the "cause and prejudice" portal.

As previously discussed, Petitioner's conclusory assertion that "failure to consider this claim will result in a fundamental miscarriage of justice" is insufficient to satisfy the "actual innocence" exception to the procedural bar. Therefore, Petitioner is not entitled to relief on Ground Four.

> E.    Ground Five:  "Appellate counsel was ineffective for failure to raise on direct appeal that the trial court erred in denying the defense's motion for judgment of acquittal, on the ground that no evidence of intent was met, nor was the reasonable hypothesis of innocence overcome (that co-defendant Jessie's act(s) were independent act(s))."

Petitioner alleges he was "only" charged as a principal in the commission of the second degree murder and attempted armed robbery (ECF No. 1 at 12–13). With respect to the second degree murder charge, Petitioner alleges the trial testimony showed that Jarvis Jessie, who was the actual shooter, committed only manslaughter, and Petitioner's only act was his "mere presence" at the scene (*id.*). Petitioner alleges the evidence did not support a second degree murder charge, and instead supported only a charge of aiding and abetting manslaughter (*id.*).  With respect to the attempted armed robbery charge, Petitioner contends he could not have been charged with this offense, because co-defendant Jessie was never charged with it, thus it was a "non-existent crime" (*id.*).  Petitioner contends his appellate counsel was ineffective for failing to argue on direct appeal that the trial

court erred by denying trial counsel's motion for judgment of acquittal ("JOA") (*id.* at 12).

Respondent asserts "it appears that Petitioner has satisfied the exhaustion requirement" by presenting a similar claim to the First DCA as Issue Three of his state habeas petition (ECF No. 14 at 43 & n.6). Respondent contends the First DCA's adjudication of the IAAC claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 43–51).

### 1.    Clearly Established Federal Law

The standard for evaluating a claim of ineffective assistance of appellate counsel is the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 764, 145 L. Ed. 2d 746 (2000) (citation omitted). The two components of an ineffectiveness claim under *Strickland* are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other. *Strickland*, 466 U.S. at 697. The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances." *Id.* at 691. Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success of on appeal. *See Jones v. Barnes*, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983)

("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").   To demonstrate prejudice, a petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, he would have prevailed on appeal.  *See Robbins*, 528 U.S. at 285.

The Eleventh Circuit has issued several decisions interpreting the *Strickland* standard with regard to IAAC claims.   Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit." *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) (internal quotation marks and citation omitted).   Additionally, where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits.  *See Diaz v. Sec'y Dep't of Corrs.*, 402 F.3d 1136, 1142 (11th Cir. 2005); *Atkins v. Singletary*, 965 F.2d 952, 957 (11th Cir. 1992); *Francois v. Wainwright*, 741 F.2d 1275, 1285–86 (11th Cir. 1984).   Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal.   *See Nyhuis*, 211 F.3d at 1344 (citation omitted).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *See Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### 2.    Federal Review of State Court Decision

Petitioner presented this IAAC claim as Issue Three in his state habeas petition (Ex. L at 10–11). The First DCA denied the petition "on the merits" without further explanation (Ex. M).

"[T]he summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision. *See Richter*, 562 U.S. at 98. The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See id.* at 102; *see also Gill*, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

The First DCA's rejection of Petitioner's IAAC claim could have been based upon the theory that (1) Petitioner failed to show that his appellate counsel's decision to "winnow out" the JOA issue was reasonable, or (2) Petitioner failed to show a reasonable probability that, but for his counsel's failure to brief this particular issue, Petitioner would have prevailed on appeal, or (3) both.

Under Florida law, appellate courts do not reverse a conviction where the conviction is supported by competent, substantial evidence. *See Jackson v. State*, 25 So. 3d 518, 531 (Fla. 2009). "Competent evidence is matter probative of the fact to be proved; that is, relevant evidence that does not fit within any rule of exclusion. Evidence is substantial if a reasonable mind might accept it to support a conclusion." *Bussell v. State*, 66 So. 3d 1059, 1061 (Fla. 1st DCA 2011) (internal quotation marks and citation omitted). Hence, a judgment of acquittal should not be granted where the State has produced competent, substantial evidence to support every element of the crime. *Id.* (citation omitted).

In moving for a judgment of acquittal, a defendant admits not only the facts stated in the evidence, but also every reasonable conclusion favorable to the State that the trier of fact might fairly infer from the evidence. *Bussell*, 66 So. 3d at 1061 (citing *Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974)). Thus, when an appellate court reviews the denial of a motion for judgment of acquittal, all evidence and inferences therefrom are viewed in a light most favorable to the State. *See McDuffie v. State*, 970 So. 2d 312, 332 (Fla. 2007); *Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002). An appellate court may not reweigh the evidence or assess the credibility of a witness. *See Tibbs v. State*, 397 So.2d 1120, 1125 (Fla. 1981). "The testimony of a single witness, even if uncorroborated and contradicted by other State witnesses, is sufficient to sustain a conviction."

*Bussell*, 66 So. 3d at 1061 (internal quotation marks and citation omitted). "If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." *Pagan*, 830 So. 2d at 803.[8]

Petitioner was charged with Principal to Second Degree Murder and Principal to Attempted Robbery with a Firearm. The trial court instructed the jury as follows with respect to the principal theory of liability, second degree murder, the lesser included offense of manslaughter, and excusable and justifiable uses of deadly force:

> If the defendant helped another person or persons commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if one, the defendant has a conscious intent that the criminal act be done and two, the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit the crime.

> To be a principal, the defendant does not have to be present when the crime is committed.
> . . . .
> If you find Donald Diego Turner was killed by Charmdar Montez Turner, Jr., you will then consider the circumstances

---

[8] Contrary to Petitioner's assertion, the convictions in this case were not based wholly upon circumstantial evidence. Eyewitnesses placed Petitioner at the scene of the shooting and attempted robbery. Therefore, Florida's special standard of review did not apply. *Cf. Gosciminski v. State*, 132 So. 3d 678, 710 (Fla. 2013) ("Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence.").

surrounding the killing in deciding if the killing was second degree murder or was manslaughter, or whether the killing was excusable or resulted from justifiable use of deadly force.

Justifiable homicide. The killing of a human being is justifiable homicide and lawful if necessarily done while resisting an attempt to murder or commit a felony upon the defendant, . . . .

Excusable homicide. The killing of a human being is excusable, and therefore lawful, under any one of the following three circumstances: When the killing is committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent, or two, when the killing occurs by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or three, when the killing is committed by accident and misfortune resulting from a sudden combat, if a dangerous weapon is not used and the killing is not done in a cruel or unusual manner.
. . . .

To prove the crime of second degree murder, the State must prove the following three elements beyond a reasonable doubt:

1. Donald Diego Turner is dead.

2. The death was caused by the criminal act of Charmdar Montez Turner, Jr.

3. There was an unlawful killing of Donald Diego Turner by an act imminently dangerous to another and demonstrating a depraved mind without regard for human life.

An "act" includes a series of related actions arising from and performed pursuant to a single design or purpose.

An act is "imminently dangerous to another and demonstrating a depraved mind" if it is an act or series of acts that: One, a person of ordinary judgment would know is reasonably certain to kill or do serous [sic] bodily injury to another. And two, is done from ill will,

hatred, spite or an evil intent. And three, is of such a nature that the act itself indicates an indifference to human life.

      In order to convict of second degree murder, it is not necessary for the State to prove the defendant had an intent to cause death.

. . . .

      To prove the crime of manslaughter, the State must prove the following the two elements beyond a reasonable doubt:

      1. Donald Diego Turner is dead.

      2. Charmdar Montez Turner, Jr., intentionally committed an act or acts that caused the death of Donald Diego Turner or Charmdar Montez Turner, Jr., procured an act that caused the death of Donald Diego Turner.

      The defendant cannot be guilty of manslaughter by committing a merely negligent act or if the killing was justifiable or excusable homicide.

      Each of us has a duty to act reasonably towards others. If there is a violation of that duty, without any conscious intention to harm, that violation is negligence.

. . . .

      In order to convict of manslaughter by act, it is not necessary for the State to prove that the defendant had an intent to cause death, only an intent to commit an act that was not merely negligent, justified or excusable and which caused death.

      To "procure'" means to persuade, induce, prevail upon or cause a person to do something.

(Ex. E at 539–44).

      Considering the testimony of Mario Brewer and Jarvis Jessie that Petitioner chose the location of the robbery and drove them there, and considering Meka Turner's testimony that Diego and Petitioner were on "bad" terms at the time of

the shooting, and that she heard Petitioner say, "Go. Get that Nigger. Shoot that Nigger. Get him," before Jarvis Jessie fired the shot in Diego's direction, a rational trier of fact could find beyond a reasonable doubt that (1) Petitioner had a conscious intent that Jarvis Jessie shoot in Diego Turner's direction, (2) Petitioner said some words which were intended to, and which did, incite, cause, encourage, or advise Jarvis Jessie to actually shoot at Diego Turner, and (3) Petitioner said those words out of ill will or spite, and not because he was resisting Diego's attempt to murder or commit a felony. The mere fact that Jarvis Jessie agreed, by virtue of his plea to manslaughter, only to admit facts showing that he intentionally committed an act that caused the death of Diego Turner, did not mean that Petitioner's jury, upon hearing the evidence, could not find that Petitioner acted with a depraved mind when he encouraged Jessie to shoot. This provided a reasonable basis for the First DCA to conclude that Petitioner failed to show that appellate counsel's failure to raise this issue on direct appeal (i.e., trial court error with respect to the denial of the motion for JOA) was not deficient. The trial evidence also provided a reasonable basis for the First DCA to conclude that Petitioner failed to show a reasonable probability of success on direct appeal if appellate counsel had argued error with respect to the trial court's denial of the motion for JOA.

With respect to the charge of principal to attempted robbery armed with a firearm, the First DCA could have reasonably concluded that Petitioner's appellate counsel was not deficient for failing to argue that the attempted robbery charge was a "non-existent crime," because the State did not charge Jarvis Jessie with it.  That argument is frivolous.  The First DCA also could have reasonably concluded there was no reasonable probability Petitioner would have succeeded on direct appeal if appellate counsel had made that argument.

Petitioner failed to demonstrate that the First DCA's rejection of his IAAC claim was contrary to or an unreasonable application of *Strickland*.  Therefore, he is not entitled to federal habeas relief on Ground Five.

> F.   <u>Ground Six:  "The due process rights of the Petitioner were violated when the State amended the Information to include a charge of aiding and abetting a crime that did not exist.  U.S.C.A. Const. Amends. 5, 6, 14."</u>

Petitioner alleges on January 23, 2013, nearly two years after the State filed the second degree murder charge, the State filed an Amended Information adding a charge of Principal to Attempted Robbery with a Firearm (ECF No. 1 at 14). Petitioner contends the crime of attempted robbery was "non-existent," because the State never charged any other participant, including Jarvis Jessie, with attempted robbery, and there was no evidence presented at trial of any robbery or attempted robbery (*id.*).  Petitioner further contends the "enhancement" (i.e., reclassification from a third degree felony to a second degree felony) was based upon a "non-

existent" firearm, because Jarvis Jessie was never charged with a crime involving use of a firearm, and Jessie was the only person who carried a gun (*id.*).

Respondent contends Ground Six is unexhausted and procedurally barred (ECF No. 14 a 52–55).  Respondent contends Ground Six appears to be the state law claim which Petitioner presented to the state circuit court as Ground Two of his Rule 3.850 motion (*id.* at 52).  Respondent asserts the state circuit court rejected Petitioner's state law claim on state procedural grounds (i.e., that the claim was not cognizable in a Rule 3.850 motion, because it could have and should have been presented on direct appeal), and the First DCA affirmed the decision (*id.* at 52–53).  Respondent contends Petitioner's having presented the state courts with only a state law issue, and the state courts' having denied the claim on state procedural grounds, the federal claim presented in Ground Six is unexhausted and procedurally barred (*id.* at 54–55).

In Petitioner's reply, he contends the failure to present a federal claim on direct appeal was caused by IAAC (ECF No. 16 at 6).  Petitioner contends he is entitled to federal review under *Martinez* and the fundamental miscarriage of justice exception (*id.*).

The court must initially determine whether Petitioner fairly presented the federal due process claim asserted in Ground Six to the state courts.  As Ground

Two of Petitioner's third amended Rule 3.850 motion, Petitioner presented the following claim:

> PRINCIPAL TO ATTEMPTED ROBBERY WITH A FIREARM IS ILLEGAL BASED ON A CO-DEFENDANT'S USE OF A FIREARM AND NO ACTUAL CHARGE EXIST [SIC] FOR DEFENDANT TO BE PRINCIPAL TO.

(Ex. J at 54–55).  Petitioner argued that the State's amending the Information to charge him with Principal to Attempted Robbery with a Firearm was illegal, because the Amended Information did not allege he personally possessed, carried, displayed, used, threatened, or attempted to use a firearm, and there was no evidence that anyone but his co-defendant, Jarvis Jessie, possessed a firearm (*id.*). Petitioner argued that the State could properly charge him with only Attempted Robbery (*id.*).  Petitioner argued that the Attempted Robbery with a Firearm charge was subject to dismissal, and the judgment and sentence on that charge was void (*id.*).  One of the two cases cited by Petitioner in his argument was *State v. Gray*, 435 So. 2d 816, 818 (Fla. 1983).  Petitioner's pinpoint citation to *Gray* was to the portion of the opinion discussing when a defendant may raise the issue of the charging document's failure to contain allegations of the essential elements of the offense.  435 So. 2d at 818.  The Florida Supreme Court's discussion of this issue included the following:

> [A] conviction on a charge not made by the indictment or information is a denial of due process of law. *Thornhill v. Alabama*, 310 U.S. 88, 60 S. Ct. 736, 84 L. Ed. 1093 (1940); *De Jonge v. Oregon*, 299 U.S.

353, 57 S. Ct. 255, 81 L. Ed. 278 (1937).  If the charging instrument completely fails to charge a crime, therefore, a conviction thereon violates due process.  Where an indictment or information wholly omits to allege one or more of the essential elements of the crime, it fails to charge a crime under the laws of the state.  Since a conviction cannot rest upon such an indictment or information, the complete failure of an accusatory instrument to charge a crime is a defect that can be raised at any time—before trial, after trial, on appeal, or by habeas corpus.

435 So. 2d at 818.

Based upon this record, the undersigned concludes that Petitioner fairly presented to the state courts a federal due process claim, but that claim was limited to whether the Amended Information omitted an essential element of Principal to Attempted Robbery with a Firearm.[9]

The state circuit court denied Ground Two of Petitioner's third amended Rule 3.850 motion on the ground that the claim was not cognizable in a motion for postconviction relief (Ex. J at 72).  The First DCA affirmed the decision without written opinion (Ex. K).

As stated in *Gray*, a claim that the charging document failed to allege the essential elements of the crime is cognizable in an application for post-conviction relief.  435 So. 2d at 818.  The state courts' opposite procedural ruling in Petitioner's case does not constitute an independent and adequate state rule of

---

[9] Arguably, Petitioner has not presented that issue in Ground Six of his § 2254 petition, but the court will liberally construe his petition as asserting the same claim he presented to the

decision; therefore, this federal court is not required to honor it, and will review the claim de novo.  *See Harris*, 489 U.S. at 260 (citation omitted).

Petitioner's argument in state court (that the Amended Information did not allege he personally possessed, carried, displayed, used, threatened, or attempted to use a firearm, and thus failed to allege an essential element of the crime charged) overlooks the fact that he was charged as a principal.  The Amended Information charged Petitioner with "Principal Attempted Robbery Armed with Firearm," and it alleged the following with respect to that charge:

> **CHARMDAR MONTEZ TURNER, JR**, on or about March 21, 2010, at and in Escambia, Florida, did unlawfully by force, violence, assault or putting in fear, and with the intent to either permanently or temporarily deprive, **attempt** to take certain property, to-wit:  **money and/or other property** the property of **Donald Turner** as owner or custodian, from the person or custody of **Donald Turner**, and in the course of committing said Robbery, carried and actually possessed a firearm, to-wit:  handgun, **or did aid, abet, counsel, or otherwise procure the commission of such offense**, in violation of Sections 812.13(2)(a), 777.011, and 777,04, Florida Statutes. (F2-L8)

(Ex. A at 2 (emphases in original)).

Florida law provides for principal liability as follows:

> Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is

or is not actually or constructively present at the commission of such offense.

Fla. Stat. § 777.011.

The Amended Information alleged all of the elements of Principal to Attempted Robbery Armed with a Firearm. Therefore, Petitioner is not entitled to federal habeas relief to the extent he asserts here the same federal due process claim that he asserted in the state courts.

Additionally, to the extent Petitioner argues in Ground Six that the Attempted Robbery with a Firearm charge was a "non-existent" crime involving a "non-existent" firearm, because Jarvis Jessie was never charged with attempted robbery or a crime involving a firearm, his claim is frivolous. For starters, the official records of Escambia County, in which Jarvis Jessie's criminal judgment is recorded (Book 6973 pages 287–94), shows that Jessie <u>was</u> convicted of manslaughter <u>with a weapon</u>. Additionally, the fact that the State did not charge Jessie with attempted robbery did not render the crime "non-existent," nor did it render the firearm used in the robbery "non-existent" as Petitioner contends.

Further, Petitioner's contention that there was no evidence presented at trial of any robbery or attempted robbery is refuted by the trial transcript. As set forth *supra* in Ground One, the State presented evidence that (1) Petitioner, Jarvis Jessie, Mario Brewer, and Anthony Bell agreed to rob someone of money or property; (2)

Petitioner drove the men to the victim's trailer; (3) the victim was known to have money; (4) Petitioner and the men exited the vehicle and approached the victim's trailer; (5) the victim and his wife became aware of the men's presence, at which time Petitioner encouraged Jarvis Jessie to shoot at the victim; (6) Jarvis Jessie fired the firearm; and (7) the men failed to complete the robbery.

Petitioner has not shown that the Attempted Robbery with a Firearm charge was a "non-existent" crime involving a "non-existent" firearm. Therefore, to the extent he asserts a federal due process claim based upon this argument, his claim is without merit. Petitioner is not entitled to relief on Ground Six.

## V.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting

§ 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  Buck v. Davis, 580 U.S.—, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing Miller-El, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to substitute Mark S. Inch for Julie L. Jones as Respondent.

And it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 6<u>th</u>  day of May 2019.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636.**